v. Zerteck, Mr. Edwards. May it please the court. Your Honor, Gary Edwards here for your defendant's appellants and the cross appellees. I would reserve five minutes for rebuttal and response time. Your Honor, we raised three issues on our appeal. The first issue relates to the district court's finding that KR Enterprises has standing as a secured party to pursue this action. The second issue related to the district court's finding that my clients were the first to materially breach their account with Evergreen, who is a non-party to this action. And the third issue relates to damages and was the district court's decision to not award a set-off for diminished value related to the RVs at issue. Counsel, there is at least one other issue that I hope you will address sooner rather than later, and that's and an amount in controversy exceeding $75,000. Not all of the dealerships have amounts in controversy exceeding $75,000. So why is this case properly here? Well, Your Honor, when this when this case was filed, it was filed as a as a case for $808,000 and some change. And it was filed as a joint liability case where all the defendants would be liable for that full amount. We did not have a decision that it was several liability until the district court found that there was diversity jurisdiction, at which point in time it also found that there was several liability. Yes, but here we are. The the fact that you've chosen to seek an aggregate amount doesn't solve the jurisdictional problem. The Supreme Court's already held that. So where are we given that some of the defendants owe less than $75,000? Well, Your Honor, I think the breakdown on that came down with how the court applied set-offs. Each of the BNRV defendants had a separate account with Evergreen. And so if you add up the invoice prices for each one of their RVs, it was only after the set-offs applied that that I believe it ended up in a judgment that was less than $75,000. So I don't have those numbers in front of me, but I believe that if you looked at each individual BNRV entity and the RVs that K&R Enterprises was seeking to collect from as it relates to each one, that would start off above $75,000, but with the set-offs would then be reduced to a lesser amount. I believe there may also be a little bit of talking past one another here. Mr. Edwards, it's correct, isn't it? The plaintiff was seeking to hold each defendant liable for the full $800,000 plus. That's correct, Your Honor. Okay, thank you. That was unsuccessful, but that was in controversy. Exactly. Yes, Your Honor, that was one of the issues, and the court ultimately found it was separate liability, but that was not appealed by K&R Enterprises. So we believe that there is diversity of jurisdiction here. Your Honor, circling back to the first issue on appeal that we have raised, which relates to the standing as a secured party, there are five points that I would like to emphasize today. The first is that the key question to be determined is what right did FirstSource have in the security interest at issue as of May 1, 2018? This is the question that... Before you get into that, Mr. Edwards, since time is short, could I ask you to address why your clients as strangers to their contracts between FirstSource and K&R are entitled to assert the parole evidence rule? Yes, Your Honor. The reason for that is that the general assignment is unambiguous. Well, that argument doesn't get in much traction because the parole evidence rule kicks in between the parties only when the agreement is unambiguous. My reading of the case law, Judge Hamilton, is that if the contract is unambiguous, then there's no exception. And yet, Indiana has recognized the exception, the stranger to the contract exception, since the Civil War. Well, Your Honor, I think the exception does apply when there's an ambiguity. Well, all right. I don't see how... If there's an ambiguity, the parole evidence rule doesn't apply at all, so there's no need for an exception. So that logic doesn't track for me, but proceed as you wish. Thank you, Your Honor. Your Honor, so the question to be asked is what right did FirstSource have in the security interest as of May 1? And the reason why this is significant is that K&R Enterprises cannot take rights any greater than FirstSource had as of May 1. So, for example, as of April 30th of 2018, which would have been two days before the general assignment at issue, did FirstSource Bank have a right to enforce the security interest on the collateral of Evergreen? And if the answer to that question is no, then K&R Enterprises did not obtain a right via an assignment to go and enforce on the security interest. And that's a question that the district court avoided, and that's one that K&R Enterprises seeks to have this court avoid, because the general assignment plainly says that the rights that K&R is taking are those of FirstSource from and after May 1, 2018. The second point is that per the 2009 loan and security agreement, the debt and default must be continuing as of May 1, 2018. And the particular provision at issue there is Section 7, and the loan and security agreement is in the special appendix at page 37. So, therefore, when we're looking at May 1, this underlying debt and Evergreen's default on not paying it, that must be continuing as of the May 1, 2018 general assignment date, and it wasn't. And how we know it wasn't gets to the third point, which is FirstSource Bank's payment history. That tells the story of the debt and the default not continuing as of March 6, 2018. The payment history is FirstSource Bank's full account of the debits and credits on this particular loan. And that payment history plainly shows that as of the May 6, 2018 payment, that the loan balance was zero, meaning it was paid off. Nothing else was owed. So, therefore, the debt and the default could not be continuing as of May 1, 2018, which is the day K&R took their rights from FirstSource Bank. The fourth point that I would emphasize, Your Honors, is that the real-time terminology that was used by the bank, and we're talking about officers of the bank, by Mr. Rose and Janice Neal at the time of this March 6, 2018 payment was payoff. And banks deal with that terminology every day. They know what a payoff is. And if we go and look at the evidence that was presented at trial, there is the emails where on March 2, there's a payoff quote. There's the email saying this is a payoff from the bank officers, and the checks are coming in to pay off the note. We then have the checks themselves, which in the memo say this is an loan payment. And then we have the March 6 email from Richard Rosenboom, who's the bank officer, who says he's waiving interest so that you can backdate the payment back to March 2, 2018. Well, you're not waiving interest and backdating to March 2, 2018 unless this is a payoff. Is there any doubt, Mr. Edwards, that the parties to the actual transaction first source in KR intended this to be one integrated transaction in which KR would be assigned those rights in return for paying off the bank? I believe no, Your Honor, and that's where we go to the general assignment. The May 1, 2018 general assignment, the court is bound within the four corners of that if it's clear and unambiguous, and is to determine the intent based upon what's set forth in that assignment. And I think that's real. Well, but that depends utterly on your client's right to invoke the parole evidence rule. Could I ask you, again, time is short, and there are several issues here. Could I ask you to address this question of the so-called diminished value set-off? I have to say, first of all, I was both surprised and disappointed by the rhetoric in your yellow brief in which you described the district court's handling of the diminished value set-off as, quote, just nonsensical from start to finish. I have to say, I didn't see anything nonsensical about it. May or may not be right, but I would have thought we've got a pretty clear market value for the goods that were sold, namely the invoice prices in April and May. Why would later changes to the market value of those goods be a set-off for the purchase price? Well, Your Honor, and first, I apologize if my rhetoric was offensive in any way. I did not intend it to be that way. What I was attempting to express was that when the court addressed the diminished value issue, the court entirely overlooked the Seventh Circuit precedent that we had cited. That's the Transcraft case, which has to do with the value of a business as a going concern, correct? It does. So how does that extend to a good where title has passed according to a price in an invoice? Well, Your Honor, I believe that in Transcraft, it's looking at the asset there, and with regards to that particular business that was there, the key was that they didn't have the insurance, and how would that impact the value of the business? Well, here, the asset is the RV, and if you don't have the manufacturer's warranty that's supposed to come with the RV, that diminishes the value of that RV. In addition, if you're flooding the market with those same RVs at 30 percent, 50 percent, 15 percent less than what the invoice price is, then you're hurting the marketability of that asset. So it was a breach of contract to go out of business? It's not a breach of contract to go out of business, Your Honor. It's a breach of contract to deliver defective RVs that are supposed to have manufacturer's warranties that do not. Well, is the set off... I can understand how, in theory, your clients might be entitled to, let's say, a discount for the price of buying an equivalent secondary market warranty, but that's not how you were calculating this evidence, these damages for the setoffs, were you? No, Your Honor. The evidence at trial was that these RVs were diminished in value depending on which witness, from 15 percent to 50 percent, and our rating of Transcraft is that you have... you do an estimate, and so you would take this percentage of diminished value, and you would reduce that from the invoice price, which would therefore increase what you should be realizing on these RVs. And that's where the diminished value of the marketability of it, because if it's not as marketable as it should be, and the evidence was that's 15 to 50 percent, then you should... First of all, the 50 percent, you don't have any evidence of an actual transaction at that of other sales where they said that some of those reached 50 percent. Well, and what about that evidence required the district court to believe it? Well, the court didn't have to believe it, but from the court's opinion, the court didn't consider it. The court overlooked it. The court's opinion says there was two witnesses on this issue, and the post-trial filings, which the district court had requested, plainly showed that there was actually four witnesses, two of which were officers of Evergreen, and those were the two that the district court entirely overlooked. And Your Honor, I would like to circle back to a minute with regards to your question about the parallel evidence. If Your Honor was to consider the parallel evidence, there was only two pieces of writing that were produced by K&R at trial related to an earlier date, one of which was a February 2018 email, and that email does not memorialize any sort of agreement. And in fact, that gives a payoff quote that was never made, and the terminology used in the email was can, which is a permissive term. It can assign. It's not a mandatory term. And the other email was from March 9 of 2018, which I believe was Exhibit F of plaintiffs at trial, and that email shows that after the bank took the payment, treated it as a payoff, waived the interest, then it sought to have a conversation with Kelly Rose about the process for making an assignment, but the email chain shows that by March 9, they still hadn't even spoken. Well, at that point in time, the loan is paid off, and once the loan is paid off, the security interest is extinguished, and that's per the contract, the 2009 Loan and Security Agreement, and it's also per Indiana law. And then we go back to the only agreement that they say. I mean, their contention is they took their rights on May 1, and that's per the general assignment. Well, First Source didn't have any rights as of that date. Your Honor, I see my time is up, so unless there's further questions, I will go ahead. Thank you, Your Honor. You know, it's far for me to be glib in a case, but this should be a simple case. It becomes complicated only because lawyers get involved. The BNRV defendants ordered and received over $800,000 worth of RVs. They didn't pay for it. That, in normal parlance, would be you owe us the money, but it becomes complicated because lawyers get involved, and they start parsing words and trying to find ways to get out of their obligations. I want to refer you, first of all, to page 11 of the District Court's opinion, and it's in the short appendix at page 11 also. We've been talking about parole evidence and what applies to what and who needs to explain what the documents mean. The District Court says the May 1 general assignment indicates plainly that it is given in connection with and in consideration of KR's purchase of certain loans made to Evergreen and for other good and valuable consideration. That same loan is identified in Exhibit A as an instrument or agreement assigned by first source to KR. So these are, although they are not strictly contemporaneous, they are part of the same transaction. How and why did it take 60 days to complete this whole transaction? I mean, I hear what you're saying about lawyers getting involved, although that criticism can work both ways in this case. But this seems pretty clumsy. I found myself wondering what would have happened to this transaction, for example, if the FDIC had had to take over first source bank halfway through on April 1st of 2018. I would think KR would have been out of luck. Very likely, Your Honor. What took so long in this case was there was a whole series of reconciliations that just simply took time. And the reconciliations were completed on April 30th and then the general assignment was signed on May 1st. If I was a businessman like these people are reconciliations were, but that's what the evidence in the case is. So it is all part of the same transaction. Going to the parole evidence rule that you asked about Judge Hamilton, I think you already said what I was going to say. But if parole evidence rule only comes into play as a stranger to the contract, if there's an ambiguity, then there's no exception. Parole evidence rule always comes into play at that point. The question about the diminished value, the 50 percent number that was used was a number that Canadian company, which they refused. The sale never went through. There is no evidence of what a discounted value would actually be. The district court referred to the testimony on this as vague and uncertain. We would posit that the valuation of RVs is something that's subject to expert testimony and certainly no expert testimony in this case. Surely it's pretty well established. I mean, Indiana, as you know, northern Indiana has a lot of RV law, right? That's correct. You've been in those cases, and I thought it was pretty well established that an owner can testify as to value, for example, if an RV has a lot of warranty problems. Could I ask you, Mr. Palmer, about this warranty issue? I mean, the defendants have at least a potential point in terms of set-off if the manufacturer's warranty that was part of the original sale of the goods essentially evaporates. But that doesn't seem to be the way the set-off evidence was presented. That's correct, Your Honor. You all both know the record a lot better than we do. That's correct, Your Honor. The warranty set-offs that were applied by the district court in claim by... No, no, no, no, no. I know those were for different RVs, right? I'm talking about as an alternative to diminished value. If the RV is supposed to come with a manufacturer's warranty good for a year or three or whatever, and that's worthless, then I can see how there might be some kind of set-off, in essence, for a cover, that is for purchasing a comparable warranty on a secondary market. But is there evidence presented as to that kind of cover or the amounts of those costs in this trial? No, Your Honor. There was no evidence of what a secondary market warranty would cost. The only evidence was that this, again, vague evidence of what a discounted price could be or might be if somebody purchased it. But there was no evidence at all on the cost of a secondary market warranty. Thank you. Hmm. What I would like to turn to now is our cross-appeal. It's a cross-appeal that's very interrelated with the direct appeal having to do with the set-offs. The difference in opinion is that the district court applied Indiana Code 26-1-9.1-402, which would allow set-offs on any... On Applied 404. I'm sorry. You're correct, Your Honor. Applied 404, Section B. I'm sorry. What we contend that 26-1-9.1-402 applies. And 402 says that security interest in an account debtor's property does not subject the holder of the security interest to liability for any contract or torts of the account debtor. That, we view, is what we have here. First Source Bank had a blanket security interest in all of Evergreen's assets, not just in an account. It had accounts receivable. It had collateral in the RVs itself. Section 404 is designed to allow offsets for security interest in an account where everything is basically co-mingled into one account. And if there's set-offs or recoupment to be made, that money comes from that single account, not from the individual item subject to the security interest. So we believe that... I'm sorry, Your Honor. I thought you were going to ask a question. We believe that 402 applies instead of 404B. If 402 had that meaning, Mr. Palmer, I would have thought there'd be an awful lot of case law around the country showing how secured lenders and assignees can avoid the counterclaims and set-offs of customers who've been left in the lurch by a manufacturer or seller who goes out of business. And the only case I see cited in support on this point is this Deutsche Bank case out of the District Court in Washington, which looks to me like a completely different situation. It is a completely different... I had thought that 404, with its express terms addressing defenses or claims of the debtor, would be kind of right on target here. If that were true, Your Honor, then 402 would be meaningless, because 402 accepts the... Well, 402 would apply, for example, if somebody who parking lot wanted a deep pocket after Evergreen's out of business, right? That's correct. It would apply in that situation, but it also applies on any liability based on contract. The statute itself refers to liability based on contract or tort. Sure. And you're not liable for all contract liability... Correct. ...of the borrower. But when you're trying to collect in this situation, as I say, I thought it was pretty clear from both the statutory text and the UCC notes that this is what it's custom tailored for. But I hear your argument, so... Okay. Thank you, Your Honor. And that leads to the second point of our cross appeal, is if the set-offs are improperly made, then there was a definitive value of the damages to which KR was entitled and pre-judgment interest would apply to that, because it would be the 808, whatever the invoice value was. Again, that's an issue that only comes up if you find that the district court should not have set off those warranty claims that it did. Unless there are any other questions, Your Honor, I will cede the rest of my time. Well, thank you, Mr. Palmer. Anything further, Mr. Edwards? Yes, Your Honors. First, with regards to KR's argument about this was all part of the same transaction and the reference to selling some additional RVs after the March payment, the question to be asked there is to pull the First Source Bank payment history and say, where are those reconciliations on that payment history? That payment history is the only payment related to the loan at issue, and the security interest that's at issue is tied to that loan. It's not my clients that owe First Source Bank. It was Evergreen that owed First Source Bank. So when that loan was paid off in March, that extinguished that security interest, and they're wanting to say, well, this was all part and parcel of the same transaction, and look at all these other ones. Well, where's that on the payment history? It's not there. Second thing is that essentially what K&R Enterprises would have this court do is set precedent that a party can come into the case and say, we received an assignment via this May 1, 2018 general assignment. This is our rights to pursue this as a secured party. Then when the litigation ensues, and they see what that means, they can go and say, oh, no, no, no, no, no. It doesn't mean what it says. And it actually means this. And when they say that it means something entirely different than what the general assignment says, they are also saying that the payment history doesn't mean what it says, which is that the loan was paid off. Doesn't it strike you, Mr. Edwards, as kind of peculiar that the law would work in a pretty strange way if the rather clumsy way this was handled wound up letting your clients keep $800,000 worth of goods without having to pay for them? Well, Your Honor, that's the empty bag myth that K&R wants to argue, but that's not the case. My client purchased the RVs from Evergreen. Evergreen's always had a right to pursue my clients and chose not to. Evergreen didn't get an empty bag when they borrowed more than a million dollars from First Source Bank. So when that loan was paid off, they got what you get when you pay off any other loan. That loan is paid off, and the right to go after the guarantor, Kelly Rose, is extinguished. And that's the way it would work in any loan situation where someone has borrowed money. Another point, Your Honor, that I would make is that when determining the diminished value set off, it's not the actual value of the set off that's at play. It's an estimate of that. And the evidence that we presented at trial and that we've noted in our brief is in our first but we set forth the various witnesses that testified to the percentage of diminished value of these RVs off the invoice price. And the district court, when he entered his opinion, overlooked two of those witnesses. And the two witnesses that he overlooked are the very officers of Evergreen and their statements about the percentages that this was discounted off of the price, which is uncontested at trial. And just so we're clear, those were discounts when Evergreen was in process of liquidation later in the summer. Is that right? Yes, Your Honor. It was a couple of months after the invoice agreements here. Well, Your Honor, I believe that they actually started liquidating in June before they actually closed. If you look at Donald M. Heiser, for example, and this will be page 23 of our opening brief, we cite that his testimony was in June of 2016. Evergreen was liquidating new Evergreen RVs to dealers at 30 to 35% off standard invoice pricing. And your clients bought in April and May? The RVs at issue, I believe, Your Honor, were all delivered in April or May. Okay. But the way this works is these are defective RVs that are supposed to have these manufacturer's warranties. And so when we get them and they haven't been sold, and then they go out of business and negate those, the ability to sell that is diminished. And it dates back to the fact that they were defective to begin with, which is what their own officers testified to. How were they defective to begin with? Well, the testimony was that they had produced a bad batch of RVs. There was something to do with the, I forget the exact terminology, the frame of these RVs that was defective. And this is detailed in our briefs. And it was uncontested. And they had put those into the market. And then that led to the increased warranty cost, which is why they wanted to get out from under this, which is why they shuttered their business so that there wouldn't be a manufacturer's warranty with these RVs. Your Honors, I see I'm out of time. Thank you, Mr. Edwards. The case has taken